UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                                       Case No. 8:24-cr-331-CPT

ROBERT ALLAN MEIER
_____/


**O R D E R**

Before the Court is Defendant Robert Allan Meier's motion to suppress evidence obtained from him on July 1, 2024, at the South Hillsborough (SoHi) Veterans Affairs (VA) clinic in Riverview, Florida.[1]  (Doc. 34).  Following oral argument on Meier's motion, the Court conducted a two-day evidentiary hearing on the matter.  (Docs. 80, 82).  The government called three witnesses at that proceeding: Lisa Bacon, who is a registered nurse at the clinic; Lieutenant Joseph Lamb, who is a supervisory VA police officer stationed at the clinic; and Dr. David Kershaw, who is a supervisory psychologist at the James A. Haley VA hospital, which is associated with the clinic.  (Doc. 82 at 7–8, 51, 94–95).  Meier did not call any witnesses, nor did he testify.

---

[1] For the sake of simplicity, the SoHi VA clinic will be referred to herein as "the clinic" unless greater specificity is required.

At the conclusion of the evidentiary hearing, the Court directed the parties to file proposed findings of fact and conclusions of law. (Doc. 76). The parties largely complied with this directive (Docs. 86, 87)[2] and also subsequently filed responses to each other's submissions (Docs. 88, 89).

Based upon the Court's analysis of the parties' filings, the testimony and exhibits introduced at the evidentiary hearing, and other pertinent portions of the record, Meier's suppression motion is denied. Below are the Court's findings of fact and conclusions of law that leads it to this conclusion. Unless otherwise indicated, the Court's factual findings are derived from its assessment of the weight of the evidence offered by the parties, including the testimony of the above witnesses.

I.

The federal government provides health care services to veterans in the Tampa area at numerous locations, including at the SoHi VA clinic where Meier has been a patient. (Doc. 82 at 63, 102–03); (Doc. 42 at 2); (Doc. 34 at 1). The clinic has two entrances for visitors, at least one of which—the front entrance—displays a sign stating, "FOR YOUR SAFETY No Guns, Knives, or Other Dangerous Weapons Allowed." (Doc. 82 at 10, 33–34; Gov't Exhs. 2, 3). The sign additionally states, "Persons entering this property consent to an inspection of all packages, luggage and containers in their possession when arriving. Refusal of consent to search is [a] basis

---

[2] Meier's submission was late by one day.

for denial of admittance." (Doc. 82 at 12; Gov't Exhs. 2, 3). Notwithstanding this sign and the fact that the clinic sometimes receives threatening communications (Doc. 82 at 105–11; Gov't Exh. 8), it does not have metal detectors at either entry point, nor does it employ a standardized screening process for people coming into the building (Doc. 82 at 26); (Doc. 80 at 18).

The interior of the clinic consists of, among other areas, a main lobby, two check-in sites, and an information desk. (Doc. 82 at 103–04); (Gov't Exh. 3). The clinic's interior also includes a police operations office and examination rooms, the latter of which are staffed by medical personnel and situated behind locked doors. (Doc. 82 at 26, 116).

In the morning hours on June 5, 2024, Bacon was asked by the physician she worked with, Dr. Beth Anlas, to call Meier regarding an appointment he had self-scheduled with Dr. Anlas for that afternoon. (Doc. 82 at 16–17). At the beginning of the call, Bacon had Meier verify his name and date of birth and asked him what issues he wished to discuss with Dr. Anlas. (Doc. 82 at 18). Meier "quickly" became "frustrated" and started complaining about the medical care he was receiving at the VA. *Id.* at 20–21. Meier then told Bacon that she "needed to make sure that when [he] d[id] come in there that you have the VA police pat me[ ] down for a gun" and later repeated this disturbing comment. *Id.* at 21–22. Meier did add, however, that his wife "ha[d] locked all [his] guns up" and that "there [we]re other people out of state [who he would] . . . go after before [he] would come for [Bacon]." *Id.* at 41. The call

3

concluded with Meier advising that he would attend his afternoon appointment, but he ultimately cancelled it.  *Id.* at 21, 24.

"Shook-up" and "f[eeling] threatened" by what she described as a "scary phone call," Bacon reported her conversation with Meier to both the VA police and the clinic's mental health team.  (Doc. 82 at 22–23, 37; Gov't Exh. 13).  Bacon also filled out a voluntary witness statement documenting the substance of her conversation with Meier.  (Gov't Exh. 11).

After being informed of Meier's call with Bacon, the VA police posted a "be-on-the-lookout" (BOLO) warning for Meier.  (Doc. 82 at 112); (Doc. 80 at 10, 14).  The VA police used such notices for visitors and patients who "posed a potential risk or danger to the facility."  (Doc. 82 at 112).  The BOLO for Meier "stated what had happened during . . . [his] phone call" with Bacon and instructed the officers to "stop and question [Meier] to determine his state of mind" if they came in contact with him.  (Doc. 80 at 10).  As for the clinic's mental health team, it decided that a "disruptive behavior flag"[3] should be placed on Meier's file, which identified him as a potential risk to healthcare worker safety.  *Id.* at 25–26, 32, 63–64, 67–71, 115.

---

[3] According to Kershaw, the term "disruptive behavior" in this context encompasses implicit or indirect threats.  (Doc. 82 at 57–58).  Such threats, he explained, include "something along the lines of, [n]ext time you see me, you know, something bad can happen, or I have a lot of firearms, things like that."  *Id.* at 58.  Kershaw further explained that, in Meier's case, the necessity of the disruptive behavior flag on his file would not have been reviewed until after the mental health team "s[aw] how it went at [Meier's] next appointment," *id.* at 77, which—as discussed below—was not until July 1, 2024.

Later during the morning on June 5, 2024, deputies with the Hillsborough County Sheriff's Office (HCSO) went to Meier's residence to perform a wellness check on him. *See* (Doc. 82 at 114; Gov't Exh. 9). Upon speaking with officers at the door, Meier became "irate" and slammed the door on the officers. *Id.* The HCSO did not take any further action relative to Meier because it determined that he did not meet the requirements for hospitalization under the Baker Act.[4] (Doc. 82 at 114–15; Gov't Exh. 9).

Nearly a month afterwards, on July 1, 2024, Bacon saw that Meier had self-scheduled for an appointment with Dr. Anlas at 12:30 p.m. that day. (Doc. 82 at 112). As far as the VA staff knew, this represented Meier's first visit to the clinic since his June 5, 2024, call with Bacon. (Doc. 82 at 24, 116–17); (Doc. 80 at 8). Due to the threatening nature of that call, Bacon went to locate the VA police so that she could alert them about Meier's impending arrival. (Doc. 82 at 24, 26, 36, 46). Bacon found VA police officer Eddie Johnson and told him that she and Dr. Anlas "were concerned about the previous phone call" with Meier, that a disruptive behavior flag had been placed on Meier's file, and that she and Dr. Anlas wanted the police to escort Meier back to the examination room where he was going to be seen. *Id.* at 39, 46–47, 112;

---

[4] "The Baker Act is a Florida law that allows for people with mental illnesses to be held involuntarily for up to [seventy-two] hours in a mental health treatment facility if they meet certain criteria." *Watkins v. Bigwood*, 2020 WL 5367325, at *1 n.2 (S.D. Fla. Sep. 8, 2020), *aff'd*, 2020 WL 5938771 (S.D. Fla. Oct. 7, 2020).

(Doc. 80 at 8–9).   Bacon explained at the evidentiary hearing why she took this

precautionary measure:

> Gov't.        And why did you look for the VA police?
>
> Bacon.        Well, because we do not have metal detectors at the clinic,
> and [Meier] was scheduled for an appointment with Dr.
> Anlas.  And once you take [patients] from the front, which
> is a locked door, and you bring them back, we're all sitting
> ducks back there.  And so I really wanted to make sure that,
> you know, if those threats  . . . [Meier] was saying on the
> phone w[ere] going to be a possibility, I wanted him to have
> a police escort to the room.  The[ police] couldn't go in the
> room, but . . . [they could] bring him to [the physician's]
> room.  And . . . they need[ed] to know . . . we wanted the
> support.

(Doc. 82 at 26).  Bacon also reiterated her apprehensions about Meier later on in her

testimony.

> Gov't.        And why were you concerned about [Meier] being escorted
> back?
>
> Bacon:        Because the last conversation I had with him was very
> threatening and it just—you see it on the news, and I didn't
> want to take any chances. . . .  I wanted to keep everybody
> safe, myself safe, and things like that[.]

*Id.* at 47.

After Johnson spoke with Bacon, Johnson informed Lamb about what he had

learned regarding Meier.  (Doc. 82 at 112; Doc. 80 at 8).  By that point in his career,

Lamb  was  a  seasoned  officer,  having  previously  served  in  a  number  of  law

6

enforcement positions, including as a patrolman and as a long-time member of the Air Force's security police.  (Doc. 82 at 94–95).

In conjunction with his discussion with Johnson, Lamb reviewed an incident report that documented the threats Meier made during the June 5, 2024, call with Bacon, as well as Meier's interaction with the HCSO deputies at his home that same day.  (Doc. 82 at 112–15); (Doc. 80 at 18); (Gov't Exh. 9).  Lamb was also told by Bacon that there was a disruptive behavior flag on Meier's file.  *See* (Doc. 82 at 116–117, 118).  As a result of this information, Lamb concluded that the VA would stop and frisk Meier for weapons before his appointment with Dr. Anlas because, in Lamb's view, there was "reasonable cause to believe" that Meier posed a threat to the clinic's staff despite the passage of time since his June 5, 2024, call with Bacon.  (Doc. 80 at 8).  Lamb expounded on his reasons for reaching this conclusion at the evidentiary hearing:

> I decided that ]Meier] would be patted down for a weapon prior to [him] gaining access to his healthcare provider in the back of the clinic. . . .  [I did so b]ased on the circumstances of the situation, the threats that were made, [and] the fact that we hadn't seen [Meier] since the original report for the threat [on June 5, 2024], which [wa]s almost a month prior[.]

(Doc. 82 at 118–19).

When Meier arrived at the clinic on July 1, 2024, he came into the building at one of the two public entranceways, proceeded to one of the check-in areas, and was then directed to the other check-in area.  *See* (Doc. 42 at 4); (Gov't Exh. 10 at 1:20–

1:30).  No evidence was introduced at the evidentiary hearing establishing that Meier went through any kind of a screening process upon entering the clinic, or that he was even asked whether he possessed any weapons.  (Doc. 80 at 18).

Lamb was advised of Meier's arrival and utilized a Florida driver database to identify Meier's car in the clinic's parking lot.  (Doc. 82 at 126); (Doc. 80 at 30). Several minutes later, Lamb, Johnson, and another VA police officer—all of whom were equipped with body cameras—spotted Meier and requested that he come to the police operations office for a private pat-down before his appointment.  (Gov't Exh. 10 at 1:17–2:04).  As reflected in the body cam footage played at the evidentiary hearing, Meier initially complied with the officers' request and started walking with them, but then changed his mind and stated that he wished to have the pat-down completed at the information desk, which was nearby.  *See id.* at 2:05-2:21; (Doc. 82 at 127).

Before commencing the pat-down, the officers inquired whether Meier had a weapon or any other sharp object on his person.  (Gov't Exh. 10 at 2:20–2:25).  Meier responded that he "might," retrieved a folded knife from the front right pocket of his shorts, and placed the knife on the desk where he was standing.  *Id.* at 2:26–2:29. Meier also maintained his right hand next to the knife.  *Id.*  Upon being informed by one of the officers that he could not possess the knife at the clinic and that he may not get it back, *id.* at 2:30–2:37, Meier replied that the knife was "his personal property" and that he would "leave with it," *id.* at 2:42–2:46.  Meier then picked up the knife and

8

turned to depart the area. *Id*. at 2:47–2:54. At that point, the officers began to grapple with Meier, who became "very upset" and "very resistive." *Id*. at 2:50–4:02; (Doc. 82 at 127–128). The officers eventually managed to remove the knife from Meier's hand and accompanied him to the police operations office, where they completed the pat-down. (Doc. 86 at 8). That search yielded no additional weapons, *id*., and Meier was thereafter allowed to attend his appointment (Doc. 82 at 37; Doc. 80 at 42).

Based on the knife seized from Meier on July 1, 2024, Meier was charged with possessing a dangerous weapon at a federal facility in violation of the 18 U.S.C. § 930(a). (Doc. 1). His instant suppression motion, and the above proceedings it precipitated, followed.

## II.

The government advances three arguments to justify the warrantless stop and seizure of the knife from Meier: (1) the VA police were entitled to take these steps under the "special needs" exception to the Fourth Amendment's warrant requirement; (2) the VA police were also allowed to engage in these actions pursuant to the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) irrespective of the merits of either of these two theories, the evidence obtained from Meier should not be suppressed because the VA police acted reasonably and in good faith. *See* (Doc. 86 at 9). Each of these arguments will be addressed in turn.

A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject to a few exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967).  Where the government seeks to rely on one of these exceptions, it bears the burden of proving that the exception applies.  *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971).

One "narrow exception" to the warrant requirement is "where a search 'serves special governmental needs.'"  *Friedenberg v. Sch. Bd. of Palm Beach Cnty.*, 911 F.3d 1084, 1091 (11th Cir. 2018) (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989) and citing *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).  To qualify under this exception, the "special need" in question "must raise a 'concern[ ] other than crime detection,'" and must be "important enough to override the individual's acknowledged privacy interest," as well as be "sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."  *Id.* (quoting *Chandler v. Miller*, 520 U.S. 305, 314, 318 (1997)).  If the government establishes a special need, a court must then weigh (1) the "strength" of the asserted privacy expectation; (2) "the nature and extent" of the privacy intrusion; (3) "the nature of the government's special need;" and (4) the challenged practice's "efficacy at achieving the government's aims."  *Id.* at 1104.  "In limited circumstances, where the privacy interests implicated by the

10

search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 624 (1989).

The government maintains that the "special needs" exception applies here because the SoHi VA clinic "had policies permitting inspection for weapons before allowing visitors to enter." (Doc. 86 at 9). To buttress this contention, the government relies heavily on the Eleventh Circuit's decision in *Johnston v. Tampa Sports Authority*, 530 F.3d 1320 (11th Cir. 2008) (per curiam). The issue before the court in *Johnston* was the propriety of "brief," "limited" pat-down searches performed on all ticket holders seeking to attend National Football League (NFL) games at a local stadium in Tampa, Florida. *Id.* at 1322–23. The policy governing these searches was instituted at the behest of the NFL and the team that played at the stadium, the Tampa Bay Buccaneers, both of which were private entities, and was later approved by a public entity, the Tampa Sports Authority, which operated the stadium. *Id.* The impetus for the policy was the NFL's determination that its stadiums constituted "attractive terrorist targets based on the publicity that would be generated by an attack at an NFL game." *Id.* The pat-down searches focused on detecting improvised explosive devices (IEDs) and were administered to all patrons before they entered the stadium. *Id.* at 1323.

The parameters of the pat-down searches at the Buccaneers games and elsewhere were also well circumscribed.  As described by the court in *Johnston*:

> At each admission gate, screeners ask[ed] people entering the [s]tadium to hold their arms out to their side, palms up.  Screeners inspect[ed] the individual for wires, detonators or other telltale signs of an IED. Screeners then r[a]n their hands lightly along the sides of the torso and down the spine.  If the individual's skin [wa]s exposed, screeners d[id] not make contact with it.  If the individual ha[d] large pockets, the screener m[ight] ask him to empty them for review of any items.  Female inspectors conduct[ed] searches on females, and male inspectors inspect[ed] males.  Anyone who refuse[d] to be patted down [wa]s denied entry to the [s]tadium.

*Id*.

The plaintiff in *Johnston* was a season ticketholder, who, by way of his season pass, had a "revocable license for entry to the [Buccaneers s]tadium."  *Id*. at 1322. Although the plaintiff was fully aware of the new pat-down policy and expressly objected to the policy each time he went to the stadium while the policy was in effect, he nonetheless allowed himself to be searched at those games so that he could watch the Buccaneers play.  *Id*. at 1323–24.  The plaintiff, however, did contest the policy in court, arguing that it violated the Fourth Amendment.  *Id*. at 1324.[5]

The Eleventh Circuit rejected this challenge, holding that the pat-down searches of the plaintiff were covered by the consent exception to the Fourth Amendment.  *Id*.

---

[5] The plaintiff also contended that the policy contravened a similar provision in the Florida Constitution.  *Id*. at 1324.

at 1327 ("We hold that [the plaintiff] voluntarily consented to the pat-down searches[.]").  The court explained:

> [The plaintiff] knew well in advance that he would be subjected to a pat-down search by the [Tampa Sports] Authority if he presented himself at an entrance to the [s]tadium to be admitted to a Buccaneers game.  That is, he chose to submit voluntarily to the search[es,] . . . stating only a verbal objection followed by his submission to the pat-down search process and his ultimate entry into the [s]tadium to watch Buccaneers football games.

*Id*. at 1328.

The government does not mention the court's narrow holding in *Johnston*, and instead cites a lengthy footnote in the decision where the court states at one point:

> Because we determine the consent exception applies, we need not also consider whether any other "special needs" exception applies to this case.  Considering [the plaintiff's] ticket was, on its face, only a revocable license to attend NFL games, there is in our opinion at least a question concerning whether [the plaintiff's] constitutional rights would have been violated by the pat-down search, even if he had not consented to one.

*Id*. at 1327 n.7.

The *Johnston* court then proceeded in the footnote to compare the pat-downs searches implemented at the Buccaneer games with the suspicionless, warrantless searches at issue in a different case, *Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004). *Johnston*, 550 F. 3d at 1327 n.7.  As discussed by the *Johnston* court, the plaintiffs in *Bourgeois* challenged a policy instituted by the City of Columbus in Georgia that mandated suspicionless magnetometer searches of all individuals assembling on public

lands to protest military training conducted at Fort Benning, Georgia. *Id.* The Eleventh Circuit in *Bourgeois* concluded that this policy violated the First and Fourth Amendments, "in part because the [c]ity had not shown its policy fell within one of the several exceptions to the Fourth Amendment's requirements," including the special needs exception. *Id.*

The *Johnston* court then went on to point out in the footnote the "many material differences" between the search regime in *Bourgeois* and the pat-down protocol before it. *Id.* Among other things, the court observed that unlike the protestors in *Bourgeois*:

> [The plaintiff in *Johnston*] had no . . . constitutional right to enter the [s]tadium for a Buccaneers football game. None of [the plaintiff's] other rights appear[ed] to be impeded by the pat-down searches—not even a property right, as [the plaintiff's] ticket granted only a privilege and did not guarantee him a seat. [The plaintiff] simply had no right to be in the [s]tadium during an NFL football game, and the revocable license granted by his ticket made clear he could be excluded for any reason. Unlike the [c]ity's policy in *Bourgeois* . . . , the pat-down policy in [*Johnston*] was developed and mandated by the NFL Commissioner and applied exclusively to NFL events. The NFL and the Buccaneers d[id] not have a law enforcement function that could have been served by the pat-downs; the record reflects instead that the NFL crafted the policy solely to protect its patrons from harm.

*Id.*

Even assuming the government has established a special need in this case, *Johnston* is no help to it here. As an initial matter, the Eleventh Circuit in *Johnston* upheld the stadium pat-down searches predicated solely on the plaintiff's consent. While it is true that the court also discussed the special needs exception in dicta (and

14

in a footnote no less), it offered only that there was "at least a question" as to whether this exception might apply to the Buccaneers' search policy.  *Id*. at 1327 n.7.

Furthermore, the facts in *Johnston* differ substantially from the facts present in this case.  To start, the pat-down searches in *Johnston* were undertaken pursuant to a well-delineated policy, *id.* at 1322–23, while there was no standardized search protocol in place at the SoHi VA clinic here (Doc. 80 at 18).  Indeed, to the extent the VA police performed pat-down searches at the clinic at all, they appeared to have administered them so inconsistently or so infrequently that Bacon did not witness even one such search being conducted in the three-and-a-half years leading up to the July 1, 2024, stop of Meier.  (Doc. 82 at 12–13, 38).  The lack of a structured search regime, especially when coupled with the absence of any metal detectors at the public entrances to the clinic, undermine both the allegedly threatening nature of the government's asserted special need and the efficacy of the clinic's tactics (or lack thereof) for discerning whether visitors may be armed with a dangerous weapon.

In addition to this distinction, the search policy employed in *Johnston* was administered to "*all* ticket holders," *Johnston*, 530 F.3d at 1322 (emphasis added), which diminished the extent to which those pat-downs impinged upon the ticketholders' privacy interests, *see United States v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973)[6] (upholding inspections conducted at an airport boarding gate because,

---

[6] The Eleventh Circuit, in its en banc decision in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the opinions of the former Fifth Circuit rendered prior to October 1, 1981.

among other things, there is "almost [a] complete absence of any stigma attached to being subjected to [a] search at a known, designated airport search point" and because individuals searched due to "their membership in [such] a morally neutral class have less cause to feel insulted") (internal quotation marks and citation omitted); *see also United States v. Hartwell*, 436 F.3d 174, 178–80 (3d Cir. 2006) (reaching the same conclusion relative to suspicionless checkpoint searches at an airport that involved screening procedures which were "minimally intrusive" and "well-tailored to protect personal privacy"); *cf. Corbett v. Transportation Sec. Admin.*, 767 F.3d 1171, 1182 (11th Cir. 2014) (finding that the challenged "[a]irport screening [wa]s a permissible administrative search," in part, because the "security officers search[ed] *all passengers*") (emphasis added) (citing *Hartwell*, 436 F.3d at 180). Meier, by contrast, was singled out from all the other visitors at the clinic and forced to submit to a pat-down search administered by multiple VA police officers.[7]

---

[7] In its post-hearing filings, the government maintains that the VA's directives that visitors are subject to a search for weapons as a condition of entry were implemented "in conjunction with [the VA's] Workplace Violence Prevention Program [WVPP] and Patient Record Flag polices, which are neutral, administrative procedures." (Doc. 88 at 4). This claim does not survive scrutiny. A review of the VA's WVPP reveals that it espouses various objectives that do not reference warrantless searches. *VHA's Workplace Violence Prevention Program (WVPP)*, U.S. Dep't. of Veteran's Aff. (last updated Jan. 29, 2025), https://www.publichealth.va.gov/about/occhealth/violence-prevention.asp; (Gov't Exh. 5). The government's exhibit outlining the Tampa VA's visitation policy likewise does not discuss warrantless searches, stops, and/or frisks. (Gov't Exh. 4). As for the patient flag policies, the record makes clear that those policies were designed to heighten the staff's awareness of potentially disruptive patients, not to authorize or facilitate warrantless, suspicionless searches. (Doc. 82 at 24–26); (Gov't Exh. 6). Suffice it to say that none of these policies establish a firm, well-defined search protocol that is neutrally applied to all members of the public seeking to access the clinic.

16

Moreover, unlike the contested pat-downs in *Johnston* that occurred before the ticketholders gained access to the football stadium, the search of Meier was carried out well after he entered the clinic.[8] The fact that Meier was allowed to walk freely around the interior of the clinic prior to being approached by law enforcement further detracts from the government's special needs argument.

None of the other decisions the government references buttresses its position either. *See* (Doc. 86) (citing *Downing v. Kunzig*, 454 F.2d 1230 (6th Cir. 1972); *Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010); *MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006)). Akin to *Johnston*, all of these cases involved warrantless and suspicionless search protocols universally employed at the threshold of government facilities and other vulnerable areas frequented by the public.

In *Downing*, for example, the Sixth Circuit was asked to determine the constitutionality of an attempted search of an attorney's briefcase at the Federal Building in Detroit. *Downing*, 454 F.2d at 1232–33. That building "hous[ed] eleven federal district courts, the offices of congressional and senatorial representatives, the chambers of two members of the Sixth Circuit Court of Appeals, and numerous other federal agencies." *Id.* at 1232.

---

[8] The government concedes as much, acknowledging that Meier "walked in through the main entrance to the clinic [on July 1, 2024,] at 12:25 p.m." and did not encounter Lamb and the other two officers until several minutes later as he "walked from the south end of the clinic . . . towards the check-in area at the other end of the clinic." (Doc. 86 at 6–7).

17

The challenged search in *Downing* was undertaken pursuant to a policy implemented by the General Services Administration (GSA), which was responsible for promulgating all rules and regulations for federal property, and stemmed from a "recent outburst of bombings and other acts of violence." *Id.* at 1231. The policy applied to each person entering the Federal Building who carried a briefcase, package, container, etc. *Id.* at 1232. The policy, however, was specifically confined to a "cursory inspection" of "all packages" conducted "at all entrances" to the property "where there [we]re guards on duty." *Id.* at 1231–32. This cabined and tightly tailored search policy that encompassed every individual bringing a package into the Federal Building is a far cry from the discretionary pat-down of a single person performed inside the SoHi VA clinic here.

Similarly, in *Dickerson*, the Second Circuit was called upon to evaluate the constitutionality of a policy that required officers and agents stationed at the entrance to designated federal facilities to verify the authenticity of any badges possessed by individuals which either were or looked like police shields. *Dickerson*, 604 F.3d at 737–39. The goal of the policy "was to deter persons with objects resembling badges used by police officers from entering specified federal buildings where they might use the badges to gain unauthorized admittance to the offices of federal agencies and other entities." *Id.* at 737. Under the policy, all persons seeking to enter the identified federal buildings were required to walk through a metal detector. *Id.* at 751.

18

The plaintiffs in *Dickerson* argued that this compulsory search protocol amounted to an "unconstitutional extension of the special needs doctrine" and thus should be struck down. *Id*. at 750 (internal quotation marks and citation omitted). The Second Circuit disagreed, finding that "[t]here [was] little basis for, and no case law of which [they were] aware to support, the proposition that the police cannot conduct a limited search upon entry to a public building for the purpose of identifying fake badges." *Id*. For the reasons stated above, the uniformly applied and minimally intrusive search policy at issue in *Dickerson* cannot fairly be equated to the selective stop and frisk of Meier here.

Lastly, in *MacWade*, the Second Circuit was presented with the question of whether random, suspicionless container searches deployed in the New York City subway system "satisfie[d] the special needs exception to the Fourth Amendment's usual requirement of individualized suspicion." 460 F.3d 260, 263. The search policy in *MacWade* was instituted "chiefly to deter terrorists from carrying concealed explosives onto the subway system[.]" *Id*. at 264. Pursuant to the program, the New York Police Department established daily inspection checkpoints at selected subway facilities. *Id*. These checkpoints "consist[ed] of a group of uniformed police officers standing at a folding table near the row of turnstiles[, which] disgorge[ed passengers] onto the train platform." *Id*. Of import here, the officers assigned to these checkpoints:

> . . . exercise[d] *virtually no discretion* in determining whom to search. The supervising sergeant establishe[d] a selection rate, such as every fifth or

19

> tenth person, based upon considerations such as the number of officers and the passenger volume at that particular checkpoint. The officers then search[ed] individuals in accordance with the established rate *only*.

*Id*. at 265 (emphasis added). As with *Downing* and *Dickerson*, the disputed search protocol in *MacWade* is readily distinguishable from the targeted pat-down of a lone individual performed inside the SoHi VA clinic in this case.[9]

In sum, the government's efforts to justify the search of Meier under the narrow special needs exception fails. As Meier highlights, the government has not come forth with a single case where this exception has been extended to a discretionary search of a particular individual who has already been granted access to government property. *See* (Doc. 89 at 9).

B.

As noted above, the government alternatively contends that the stop and pat-down of Meier falls within the exception to the warrant requirement established by the Supreme Court in *Terry v. Ohio*. (Doc. 86 at 12–14). Under *Terry*, "[l]aw enforcement officers may briefly detain a person for investigative purposes if they have a reasonable,

---

[9] In an attempt to further bolster its special needs argument, the government also cites the Eleventh Circuit's opinion in *United States v. McArthur*, 108 F.3d 1350 (11th Cir. 1997). *See* (Doc. 86 at 10). Although the government characterizes this decision (along with *Johnston*) as "control[ling]," *id*. at 11, the only issues before the court in *McArthur* were "whether proof of adequate notice is an element of the crime of possession or an affirmative defense," and whether "a restitution order under the Victim and Witness Protection Act can only be based upon harm resulting from conduct of which the defendant was convicted," *McArthur*, 108 F.3d at 1352. *McArthur* has little, if any, relevance to the government's special needs argument and is certainly not controlling.

20

articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity." *United States v. Diaz–Lizaraza*, 981 F.2d 1216, 1220 (11th Cir.1993) (citing *Terry*).  Reasonable suspicion is a "less demanding standard than probable cause," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), and is based on the totality of the circumstances viewed "from the standpoint of an objectively reasonable police officer," *United States v. Flippo*, 759 F. App'x 907, 908 (11th Cir. 2019) (per curiam)[10] (citation omitted), taking into account "the officer's special training and experience," *United States v. Matchett*, 802 F.3d 1185, 1192 (11th Cir. 2015).  The specific facts supporting an investigative stop may be predicated not only on an officer's own observations, but also on information furnished by others, provided that such information bears "sufficient indicia of reliability." *Alabama v. White*, 496 U.S. 325, 327, 328 (1990); *see also United States v. Fields*, 178 F. App'x 890, 892 (11th Cir. 2006) (same); *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (noting that the police may conduct a *Terry* stop "if, under the totality of the circumstances, . . . from the collective knowledge of the officers involved in the stop, . . . they had an objectively reasonable suspicion that [the defendant] had engaged, or was about to engage, in a crime") (internal citations and quotation marks omitted).

Additionally, even if an officer's evaluation of the facts in making a *Terry* stop is incorrect, the stop will still be deemed to be valid as long as the officer's assessment

---

[10] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority.  11th Cir. R. 36-2.

was reasonable. *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) (collecting cases). Thus, if an officer executes a *Terry* stop due to "a mistake of fact, the only question is whether his mistake of fact was reasonable." *Id.* "Great deference is given to the judgment of [a] trained law enforcement officer[ ]" in this regard. *Id.* (citation omitted).

During the course of a *Terry* stop, an officer may conduct a frisk or pat-down of a detainee for weapons where the officer "has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27; *see also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) ("*Terry* . . . held that '[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a pat[-]down search 'to determine whether the person is in fact carrying a weapon.'") (quoting *Terry*, 392 U.S. at 24); *United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019) (en banc) ("When an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he reasonably believes may be weapons or other instruments of assault.") (citing *Terry*, 392 U.S. at 27). "'The purpose of this limited search is not to discover evidence of [a] crime, but to allow the officer to pursue his investigation without fear of violence[.']" *Dickerson*, 508 U.S. at 373 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). As a result, the scope of the search is "strictly" confined "'to that which is necessary for the discovery of weapons which might be used to harm the

22

officer or others nearby.'" *Id*. (quoting *Terry*, 392 U.S. at 26); *see also Johnson*, 921 F.3d at 997 ("'The sole justification of the search [of a suspect under *Terry*] is the protection of the police officer and others nearby,' so a frisk must remain 'reasonably related in scope to the circumstances which justified the [frisk] in the first place[.]'") (quoting *Terry*, 392 U.S. at 20, 29).

Supervisory officer Lamb and the other VA police officers working with him had reasonable suspicion to perform an investigatory detention and pat-down of Meier here. At the time of the *Terry* stop, the SoHi VA clinic had flagged Meier as a safety risk because of the express and implied threats he made in his call with Bacon on June 5, 2024. These threats included Meier's statement suggesting he would be armed and his statement that he would be "com[ing] for" Bacon. Based on this information, which came from a credible source (i.e., Bacon), and affording to due deference to Lamb's law enforcement experience and expertise, it was reasonable for him to believe that Meier might possess a gun or other dangerous weapon when he arrived at the clinic on July 1, 2024. *See United States v. Brown*, 2021 WL 4955823, at *1 (11th Cir 2021) (per curiam) ("An officer may warrantlessly seize an individual for an investigatory detention if he has reasonable grounds to believe that the suspect is armed and dangerous.") (citing *Terry*, 392 U.S. at 28–29); *Johnson*, 921 F.3d at 997; *United States v. Bonds*, 829 F.2d 1072, 1075 (11th Cir. 1987) (determining that an officer's pat-down of a defendant was warranted where the officer reasonably believed the defendant was a "person to be feared").

23

In an effort to avoid this outcome, Meier contends that the Lamb and other VA officers relied on stale information in stopping him.  (Doc. 87 at 8–10); (Doc. 89 at 2–6).  This argument is unsupported.  Whether information is stale depends on the "peculiar facts of each case."  *United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000) (internal quotation marks and citations omitted).  The relevant factors courts consider in addressing staleness include the maturity of the information, the "'nature of the suspected crime (discrete crimes or ongoing conspiracy),'" the "'habits of the accused,'" and the "'character of the items sought.'"  *United States v. Wade*, 551 F. App'x 546, 548 (11th Cir. 2014) (quoting *United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000)).

Here, the evidence shows that Meier's visit to the SoHi VA clinic on July 1, 2024, was the first time he had been there since his call with Bacon.  While it is true—as Meier points out (Doc. 89 at 3–4)—that twenty-six days had passed in the interim, this was hardly enough time to preclude a seasoned officer like Lamb from believing Meier was carrying a weapon.  *See United States v. Samuel*, 580 F. App'x 836, 840 (11th Cir. 2014) (indicating that "threatening . . . messages" generated "reasonable suspicion justifying an investigatory stop" of the message-sender); *United States v. Davis*, 65 F. Supp. 3d 1352, 1365 (M.D. Fla. 2014) (finding that twenty-one days was "not so long as to make . . . knowledge stale" even where the relevant offense was not part of an ongoing conspiracy); *see also United States v. Doaty*, 488 F. Supp. 3d 546, 553 (W.D. Ky. 2020) (credible information that an individual possessed firearms—which

24

constituted "continu[ous]" conduct—supported a finding of reasonable suspicion despite the fact that the information was up to a month old).

Contrary to Meier's assertion, the mere fact that he claimed his wife had locked up his guns does not undermine this analysis. (Doc. 89 at 4). As an initial matter, this claim by Meier effectively amounted to an admission that he owned not just one gun but multiple firearms. Further, the VA police can hardly be expected to have accepted Meier's word that he could not access these weapons simply because he made that assertion in a phone call without any confirmation at all from his wife. This is especially true since Meier informed Bacon in the same conversation that he would be "com[ing] for [her]" and that he should be patted down when he arrived at the clinic.

Nor is the Court persuaded by Meier's contention that "it defies logic . . . [the] VA police would need to conduct a suspicionless search nearly a month" after Meier's call with Bacon since his "wife, who lived with him and knew him best, felt safe enough to remain in the home after merely securing firearms." (Doc. 89 at 4). There is no evidence in the record that Meier was angry or upset with his spouse. There is, however, ample evidence to buttress the Lamb's articulated belief that Meier might seek to harm Bacon or the other individuals at the clinic.

The "nature of the suspected crime" further undermines Meier's staleness argument. As discussed previously, Meier's June 5, 2024, call with Bacon raised the prospect that, at some unspecified time in the future, he would show up at the clinic with a firearm and attempt to use that weapon against the VA staff. Due to the

anticipatory nature of this offense, it did not become ripe until Meier actually presented himself at the clinic, which did not occur until July 1, 2024. As a result, the threatening information the clinic received from Meier on June 5 was not stale when he next visited the clinic on July 1.

Regarding Meier's habits, his comments to Bacon during the June 5 call indicated that he had an established interest in guns and that he was familiar with how to use them, be it through the regular handling of firearms or otherwise. *See* (Doc. 82 at 41). These statements also suggested the Meier might make it a habit of arming himself if and when he perceived it necessary or appropriate to do so.

Finally, the "character of the items sought" additionally cuts against Meier's staleness challenge. Be it the guns Meier threatened to use in his June 5 call with Bacon (Doc. 87 at 2), or the knife the officers eventually found on his person on July 1, *id*. at 5–6, such weapons are not perishable and can be kept for an extended period of time.

In sum, the Court concludes that Lamb and the other VA officers had reasonable suspicion to perform a *Terry* stop and pat-down of Meier at the SoHi VA clinic on July 1, 2024, and that the information upon which they relied in doing so was not stale.

## C.

The government's remaining contention—as referenced previously—is that even if its special needs and *Terry* arguments are infirm, the challenged evidence should

not be suppressed because the VA police acted reasonably and in good faith.  *See* (Doc. 86 at 15–17); (Doc. 88 at 5–6).  To bolster this contention, the government cites, among other authority, the Supreme Court's decision in *Davis v. United States*, 564 U.S. 229 (2011).  *See* (Doc. 86 at 15).  In *Davis*, the Court held that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the [Fourth Amendment's] exclusionary rule does not apply."  *Davis*, 564 U.S. at 249–50.  Relying on this language, the government argues that by the time of the stop and frisk of Meier on July 1, 2024,, the Eleventh Circuit already had "unequivocally recognized that the government has a special need to pat[-]down visitors to government buildings for weapons."  (Doc. 88 at 5) (citing *Johnston*, 530 F.3d at 1326 n.7).

In light of the above findings, the Court need not address the government's good faith argument.  The Court notes only that, for the reasons discussed earlier, it takes a dim view of the government's assertion that the VA could reasonably rely on *Johnston* as clear, binding authority sanctioning the pat-down of Meier under the special needs exception given the particular circumstances presented in this case.  *See United States v. Lara*, 815 F.3d 605, 613 (9th Cir. 2016) ("declin[ing] to expand the [good faith] rule in *Davis* to cases in which the appellate precedent, rather than being binding, is (at best) unclear"); *United States v. Buford*, 632 F.3d 264, 276 n.9 (6th Cir. 2011) (ruling that the

"precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation") (internal quotation marks and citation omitted).[11]

III.

Based upon the foregoing, Meier's motion to suppress all evidence and statements obtained during the July 1, 2024, stop and frisk of him is denied.

SO ORDERED, in Tampa, Florida, this 23rd day of February 2026.

_____
HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record

---

[11] The Court also notes that there is no credible evidence that the VA police were aware of the state of the law on this legal question when they stopped Meier on July 1, 2024. *See Davis*, 564 U.S. at 241 (stating that officers should "learn 'what is required of them' . . . and . . . conform their conduct to these rules") (quoting *Hudson v. Michigan*, 547 U.S. 586, 599 (2006)).